# WEAVER v. PUBLIC SERVICE COMMISSION OF WYOMING
### (No. 1561; June 18, 1929; 278 Pac. 542)

464

For the appellant there was a brief by *M. L. Bishop, Jr.,* of Casper, Wyoming, and the cause was submitted for the appellant on Mr. Bishop's brief.

For the respondent there was a brief by *W. O. Wilson,* Attorney General, *J. A. Greenwood,* Deputy Attorney General, and *Fenimore Chatterton* of Cheyenne, and oral argument by *Fenimore Chatterton.*

466

Blume, Chief Justice.

By Chapter 98 of the Session Laws of 1927 the legislature of this state passed an act "to supervise and regulate the transportation of persons and property for compensation." By Section 1 of the act persons and corporations are included within the meaning thereof and the term "Transportation company" as used by the act is defined as including every person and corporation operating or managing any motor vehicle "used in the business of transportation of persons or property by contract or agreement for compensation or as a common carrier for compensation over any public highway in this state between fixed termini, or over regular or irregular routes not operating exclusively within the limits of an incorporated city or town." The term "compensation" means, by the definition of that section, "transportation of any person for hire or the carrying of any freight or article of commerce for hire in any motor vehicle." By Section 2 of the act every person and corporation included as above mentioned is forbidden to transport any person or property for compensation on any public highway in this state except in accordance with the provisions of the act. Section 3 gives the Public Service Commission of this state broad and comprehensive powers to regulate any such transportation company; to fix reasonable rates, fares and charges to be charged; to prescribe rules and regulations

for the government of such companies; to require them to provide adequate facilities for transportation; to supervise and regulate their accounts, service and safety of operation; to require them to file reports and furnish other data from time to time as the commission may require, and in many other ways to regulate and supervise such companies as is ordinarily done in the case of public service corporations. Section 4 of the act reads as follows:

"No transportation company, as defined in Section one of this act, shall hereafter operate any motor vehicle, motor truck, motor bus, bus trailer, semi-trailer or other trailer in connection therewith for the transportation of persons or property for compensation on any public highway of this state without having first obtained from the Public Service Commission of Wyoming a certificate which shall set forth the special terms and conditions under which permission is granted to operate any of the vehicles above mentioned. No permit held or owned or obtained by any transportation company shall be assigned, leased or transferred except upon authorization of the Public Service Commission of Wyoming. A permit issued by the Public Service Commission to operate any motor vehicle or other vehicle prescribed by this act for compensation over any of the highways of the state of Wyoming shall not be an exclusive right or license to operate over any route, road, highway, or between any fixed termini, but the special conditions of service and protection or such other conditions as may be set out in such permit, together with the general regulations of the Public Service Commission, shall be the conditions with which any other transportation company must comply before being granted a certificate to operate motor vehicles or other vehicles in similar service, and any transportation companies complying with such conditions shall be entitled to a like certificate."

By Section 5 of the act the Public Service Commission is empowered to revoke any certificate upon violation of the conditions therein contained. By Section 6 of the act every transportation company is required to furnish a bond

in sufficient amount and with sufficient sureties for the protection of the public or to deposit proper securities in lieu thereof, as the Commission might determine. By Section 8 of the act the Commission is authorized, in the regulation of the acts above mentioned, to require an annual license fee, which is specified in the statute. Other sections of the act provide heavy penalties for the violation of the act. So far as we can see, no other legislative enactments have any particular bearing in this case.

The Public Service Commission of this state claims that W. H. Weaver, the plaintiff in this case, comes within the provisions of the foregoing act, while the plaintiff claims that he does not. The case is here upon an agreed statement of facts as to the business of the plaintiff, under the provisions of Section 5786, Wyo. C. S. 1920, and it is agreed by the parties hereto as follows:

"That the said plaintiff is engaged in the business of transporting by motor vehicles various kinds of personal property, but more particularly heavy oil well equipment, for divers and sundry persons, firms and corporations, for compensation, over the public highways of the state of Wyoming, to various points in said state. That the nature of plaintiff's said hauling necessitates his using practically every highway in the state of Wyoming some time during the year, and frequently plaintiff hauls property to oil camps in isolated parts of said state many miles from a graded highway. That plaintiff does not and cannot operate according to any fixed schedule of time. That the consideration to be paid for said hauling is fixed and determined by agreement between the parties prior to the commencement of said work. That plaintiff transports said various kinds of personal property for whomsoever agrees with him for the transportation of the same, he reserving the right to refuse to enter into contracts for transportation of such property, and that plaintiff is not in any way engaged in the transportation of persons for compensation. That plaintiff does not operate exclusively within the limits of an incorporated city or town. That plaintiff's said business has heretofore been carried on

and conducted without regulation or supervision by the Public Service Commission of Wyoming.''

1. We held in the case of Public Service Commission v. Salt Creek Transportation Company, 37 Wyo. 488, 263 Pac. 621, that the legislative act in question is constitutional in so far as it affects common carriers, and the first question to be determined herein is as to whether or not the plaintiff Weaver comes within the definition of that term. The fact that he makes a contract in every case in which he transports property over the highways in the state is, of course, not necessarily determinative of the point as to whether or not he is a common carrier, for he might make such contracts simply to escape the duties of a common carrier by subterfuge and evasion. Harmon v. Power Company, 175 App. Div. 627, 162 N. Y. S. 590; State v. Price, (Wash.) 210 Pac. 787; Michigan Public Utilities Commission v. Krol, 245 Mich. 297, 222 N. W. 718; Restivo v. Public Service Comm., 149 Md. 30, 129 Atl. 884; Public Service Comm. v. Maryland Dairy, 150 Md. 641, 135 Atl. 136; Bruer v. Public Utilities Commission, 118 Oh. St. 95, 160 N. E. 623. The making of such contracts is only one of the facts to be considered in determining as to whether or not a person is a private or a public carrier. The main criterion as to whether he is the latter depends upon whether he holds himself out as ready to serve everyone of the public alike to the limit of his capacity, and within the sphere of the business carried on by him. In the case of Gerhard & Hey v. Cattaraugus Tanning Co., 241 N. Y. 413, 150 N. E. 500, the court said:

"The difference between a common and a private carrier is well understood. A common carrier for personal property is one who agrees for a specified compensation to transport such property from one place to another for all persons that may see fit to employ him. * * * One is not a common carrier unless he indicates to the public that he is ready and willing to do business for all that

may see fit to employ him 'up to the capacity of his facilities.' * * * In order to constitute one a common carrier, he must be engaged in a business which necessarily involves public interest.''

And it is further held that

''the law applicable to common carriers is peculiarly rigorous and it ought not to be extended to persons who have neither expressly assumed that character nor by their conduct and from the nature of their business justified the belief on the part of the public that they intended to assume it.'' 4 R. C. L. 546; 10 C. J. 41.

We ought not, accordingly, declare the plaintiff in this case a common carrier unless it is reasonably clear that he in fact is one or has held himself out as such. Now there is nothing in the statement of facts before us which in any way whatever indicates that Weaver held himself out to the public generally. It is intimated that the contracts which he makes in individual cases are made merely for purposes of subterfuge and pretense, but there is nothing of that kind to be inferred from the statement of facts before us, and we cannot, accordingly, assume that to be true in this case. It may be unfortunate that the case is here upon an agreed statement of facts instead of having been tried, so that all of the facts and circumstances might be before us. But in view of the record in the case, we are unable to say that the plaintiff is in fact a common carrier, and we have found no case in which, under like facts, anyone has been held to be such. On the contrary, a number of decisions, we think, indicate otherwise. Sanger v. Lukens (C. C. A.) 26 Fed. (2d) 855, reversing 24 Fed. (2d) 226; Film Transport Co. v. Michigan Public Utilities Co., (D. C.) 17 Fed (2d) 857; Hissem v. Guran, 112 O. S. 59, 146 N. E. 808; Belfast Ropework Co. v. Bushel, 1 K. B. (1918) 210; Terminal Taxicab Co. v. Kutz, 241 U. S. 252, 36 Sup. Ct. 583; Bell v. Harlan, 57

App. D. C. 255, 20 Fed. (2d) 271; Towers v. Wildason, 135 Md. 677, 109 Atl. 471; Electric Supply Stores v. Gaywood (1909) 100 L. T. (N. S.) 855; Purple Truck Garage Co. v. Campbell, 119 Ore. 484, 250 Pac. 213, 51 A. L. R. 816.

One of the cases cited by counsel for the Public Service Commission in support of his contention that the carrier in this case is a common carrier is Sanger v. Lukens, 24 Fed. (2d) 266. Unfortunately, however, that case, upon appeal to the Circuit Court of Appeals, was reversed. 26 Fed. (2d) 855. That case, too, was submitted upon an agreed statement of facts, which reads as follows:

"That said business is that of conducting general storage and repair of automobiles and auto trucks; the hiring of auto trucks, with drivers or chauffeurs, for the purpose of hauling commodities for others, solely upon such terms and prices, within and without the state of Idaho, as each individual contract of hiring may require and be agreed upon by plaintiff and such other person, company, or corporation, which hiring plaintiff alleges he has the right to refuse to do, if unable to obtain terms and prices satisfactory to himself."

In view of that broad statement of facts the court held that it was not in position to call the carrier a common carrier. An instructive case is the case of Terminal Taxicab Co. v. Kutz, supra, in which four-tenths of the business of the plaintiff was held to be private and not public business. Mr. Justice Holmes, who delivered the opinion of the court, said in part as follows:

"The rest of the plaintiff's business, amounting to four-tenths, consists mainly in furnishing automobiles from its central garage on orders, generally by telephone. It asserts the right to refuse the service, and no doubt would do so if the pay was uncertain, but it advertises extensively, and, we must assume, generally accepts any seemingly solvent customer. Still, the bargains are individual, and however much they may tend towards uniformity in

price, probably have not quite the mechanical fixity of charges that attends the use of taxicabs from the station and hotels. There is no contract with a third person to serve the public generally. The question whether, as to this part of its business, it is an agency for public use within the meaning of the statute, is more difficult. * * * Although I have not been able to free my mind from doubt, the court is of opinion that this part of the business is not to be regarded as a public utility. It is true that all business, and, for the matter of that, every life in all its details, has a public aspect, some bearing upon the welfare of the community in which it is passed. But, however it may have been in earlier days as to the common callings, it is assumed in our time that an invitation to the public to buy does not necessarily entail an obligation to sell. It is assumed that an ordinary shopkeeper may refuse his wares arbitrarily to a customer whom he dislikes, and although that consideration is not conclusive (German Alliance Co. v. Kansas, 233 U. S. 407), it is assumed that such a calling is not public as the word is used. In the absence of clear language to the contrary it would be assumed that an ordinary livery stable stood on the same footing as a common shop, and there seems to be no difference between the plaintiff's service from its garage and that of a livery stable. It follows that the plaintiff is not bound to give information as to its garage rates.''

In the case of Belfast Ropework Co. v. Bushel, supra, the defendant was sought to be held liable as a common carrier. He traded as Oliver Bushel & Company, and on his invoices described his business as that of an automobile engineer and haulage contractor. He had an automobile agency and sold a few heavy motors, but the scarcity of petroleum prevented the development of that part of his business. He had two motor trucks, which he ran partly as a means of advertising his business and partly to make money by them until a purchaser could be found for them. They were at all times for sale. His carrying business was considerable, and when he had more goods to carry than his two trucks could manage, he hired

trucks from other persons or contracted with them to carry for hire. The charges made by him depended largely upon the state of his business and upon the customers' needs of the goods. When getting orders through a traffic agent he did not trouble about the name of the customer and accepted or rejected orders according as the rates, routes, and class of goods were or were not satisfactory. The court held the defendant to be a private carrier, and said in part as follows:

"There seems to be a general agreement, whether one consults the authorities or the text-books, that to make a man a common carrier he must carry as a public employment; he must carry for all indifferently; he must hold himself out as ready to carry for hire as a business and not as a casual occupation *pro hac vice*. He is sometimes described as a person who undertakes for reward to carry the goods of such as choose to employ him from place to place. To this I think it would be safe to add the words 'at a reasonable rate.' All other carriers by land are private carriers. * * * One would suppose that there ought to be some simple test by which it could be determined without difficulty whether a man is a common carrier or a private carrier, but now that the old idea that to be a common carrier by land a man must carry between fixed termini, or at any rate within defined districts, has been abandoned, I confess that I find considerable difficulty in framing the question the answer to which would be conclusive one way or the other. * * * For the purpose of my present decision I fall back upon this question, Did the defendant, while inviting all and sundry to employ him, reserve to himself the right of accepting or rejecting their offers of goods for carriage whether his lorries were full or empty, being guided in his decision by the attractiveness or otherwise of the particular offer and not by his ability or inability to carry having regard to his other engagements? Upon the facts as found by me I answer that question in the affirmative, and in my opinion that answer shows that he is not a common carrier.''

In the case of Film Transport Company v. Michigan Public Utilities Commission, supra, the plaintiff was a

transportation company operating upon the public highways of Michigan and engaged in transporting moving picture films between exchanges and from theatre to theatre in the course of showing. All transportation was in pursuance to written contracts between theatre owners and the plaintiff, and no transporting was done other than pursuant to written contracts. Plaintiff did not engage in the general trucking business, but had contracts with 150 theatres in the southern portion of the state. He did not advertise or solicit business or hold himself out to transport for the public indiscriminately, but he did operate over a definite territory and over fixed routes. The court held that the plaintiff was a private carrier. In the case at bar, the extent of the plaintiff's business does not appear in the agreed statement of facts, although counsel for the Public Service Commission attempts in his brief to give it, but of course these statements of counsel cannot be taken into consideration. He lays considerable stress on the word "whomsoever" in the sentence that plaintiff transported various kinds of personal property for "whomsoever" agreed with him for the transportation. But that term can simply mean that he transported these goods for the parties with whom he agreed, and is not, we think, indicative of the fact that he held himself out to haul for the public generally and indiscriminately. We think that, as already stated, we are constrained to hold that the agreed statements of facts before us does not show plaintiff to be a public, but only a private, carrier.

2. Counsel for the Public Service Commission—brushing aside his frequent reference to "pretending private carriers"—in effect contends that the state has broad and comprehensive powers to regulate the use of highways, that the legislative act in question has done so, and that plaintiff is subject to the provisions of that act even though he is a private carrier. As already stated, in Section 1 of the act the term "transportation company" applies to any person or corporation operating "any motor vehicle * * * used

in the business of transportation of persons or property by contract or agreement for compensation, *or* as a common carrier for compensation over any public highway in this state between fixed termini, *or* over regular or irregular routes.'' Some of the courts have been hesitant to construe legislative acts containing similar language as applying to private carriers. State v. Smith, (Ariz.) 252 Pac. 1011; Mooney v. Tuckerman, (R. I.) 144 Atl. 891; Smallwood v. Jeter, 42 Idaho 169, 244 Pac. 149. However, the question as to the power of the legislature over private carriers becomes a constantly more pressing one, and must be elucidated at some time, and though we refused to discuss the point in Public Service Commission v. Salt Creek Transportation Company, supra, though urged to do so, we can hardly evade doing so now, for it seems clear from the foregoing language of the legislative act in question that the legislature attempted to regulate not only carriers which carry goods or passengers between fixed termini and on other roads, but also attempted to regulate private carriers as well as common carriers, and the question is how far the legislature may go in that respect. Some of the cases contain broad and sweeping language, and distinguish between what is called the ordinary use of highways and the use made thereof by motor vehicles which carry for hire—apparently, whether as private or common carriers, although most all of the cases relate to common carriers. Thus it was said in Ex parte Dickey, 76 W. Va. 579, 85 S. E. 782, L. R. A. 1915 F 840:

''The right of a citizen to travel upon the highway and transport his property thereon, in the ordinary course of life and business, differs radically and obviously from that of one who makes the highway his place of business and uses it for private gain, in the running of a stagecoach or omnibus. The former is the usual and ordinary right of a citizen, a right common to all, while the latter is special, unusual and extraordinary. As to the former, the extent of legislative power is that of regulation; but as to the latter,

its power is broader, the right may be wholly denied, or it may be permitted to some and denied to others, because of its extraordinary nature.''

So in Hadfield v. Lundin, 98 Wash. 657, 168 Pac. 516, L. R. A. 1918 B, 909, Ann. Cas. 1918 C, 942, which cites a number of cases on the subject, it is said:

''The streets and highways belong to the public. They are built and maintained at public expense for the use of the general public in the ordinary and customary manner. The state, and the city as an arm of the state, has absolute control of the streets in the interest of the public. No private individual or corporation has a right to the use of the streets in the prosecution of the business of a common carrier for private gain without the consent of the state, nor except upon the terms and conditions prescribed by the state or municipality, as the case may be. The use of the streets as a place of business or as a main instrumentality of business is accorded as a mere privilege, and not as a matter of natural right. * * * These cases, though involving regulatory statutes or ordinances, all recognize and are based upon the fundamental ground that the sovereign state has plenary control of the streets and highways, and, in the exercise of its police power, may absolutely prohibit the use of the streets as a place for the prosecution of a private business for gain. They all recognize the fundamental distinction between the ordinary right of a citizen to use the streets as a place of business or main instrumentality of a business for private gain. The former is a common right, the latter an extraordinary use. As to the former the legislative power is confined to regulation, as to the latter it is plenary and extends even to absolute prohibition. Since the use of the streets by a common carrier in the prosecution of its business as such is not a right, but a mere license or privilege, it follows that the legislature may prohibit such use entirely without impinging any provision either of the state or federal Constitution. * * * If any proposition may be said to be established by authority, the right of the state in the exercise of its police power to prohibit the use of the streets as a place of private business, or as the chief instrumentality in conducting such business, must be held so established. Nor can it be questioned that the power to

prohibit includes the power to regulate even to the extent that the regulation under given conditions may be tantamount to a prohibition. Where the power to prohibit exists, the reasonableness of any regulation is palpably a legislative question, pure and simple.''

In Northern Pac. Ry. Co. v. Bennett, (Mont.) 272 Pac. 987, it is said:

''No person has a vested right to use the public highways for a commercial purpose, and denial of the mere license to do so takes from him no property or property right.''

In State v. Sterrin, 78 N. H. 220, 98 A 482, the court said:

''In each of these cases (cited) it is pointed out that the operation of an automobile upon the public highways is not a right but only a privilege which the state may grant or withhold at pleasure.''

These cases are illustrative of what many of the courts have said on the subject of the rights and privileges on highways. The language used in some of them is so broad, that it would seem to be necessary to examine the subject more in detail, so that we may get our moorings, and not be led astray in determining what is and what is not constitutional legislation, particularly in view of the fact that we seem to be but at the threshold of attempted regulations of the use of highways, not only in this state, but in every state of the Union. If the foregoing cases are to be literally construed—which we do not think should be done, for they nearly all relate to common carriers—then the legislature has the right to absolutely prohibit the calling of a private carrier, for that calling must necessarily be all or substantially all followed on the public ways; it has in that event the right to do so despite the provision of Article I, Section 2, of our constitution, that ''in their inherent right of life, liberty and the pursuit of happiness all members of the human race are equal,'' and despite Section 6 of the

same article that "no person shall be deprived of life, liberty or property without due process of law," and despite Section 7 of the same article to the effect that "absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority," and despite the provisions of Section 33 of the same article that "private property shall not be taken or damaged for public or private use without just compensation." In other words the power of the legislature over the highways of this state is, in that event, a paramount power, liberty to contract to act as a private carrier may be taken away, and everyone may be left destitute of the right to seek his happiness in that calling. Of course, if the state owned the highways in a proprietary capacity, that would be true. A proprietor has the right to prohibit others from using his property. He may, doubtless, grant or withhold the use of it by others "at pleasure." But the state does not own the highways in that capacity; these exist, or at least are maintained, solely by reason of the taxes paid, and contributions made, by private individuals and corporations, including private carriers. Highways exist for the benefit of the members of the public at large, and the only right which the state has to regulate or prohibit their use must be sought in the police power of the state to promote the safety, peace and general welfare of the people. Unless the liberty to contract to act as private carrier and to seek happiness in that calling interferes with that safety, peace and general welfare, the legislature has no right to forbid or control it. The right to make contracts is both a liberty and a property right, and is within the protection of the guaranty against taking of liberty or property without due process of law, and while that right is subject to reasonable restraint in the interest of the public welfare, arbitrary and unreasonable restrictions or regulations are void. 12 C. J. 1200. The legislature may prohibit occupations that are detrimental to the public welfare, but only if detrimental. 12 C. J. 1159, 1161. The power to regulate

and prohibit the use of the highways should be construed in the light of these principles and fundamental rules of law, aside from the limitations in the fourteenth amendment of the Constitution of the United States, and the inexorable conclusion follows that whatever rules and regulations are made in connection with the use of highways should be reasonable, operate with equality, and have some tendency to accomplish the end in view. The rule of reasonableness and equality applies, in the light of the constitutional provisions above mentioned, alike to regulations made by municipalities and by the state. In Bashfield, Ency. of Automobile Law, 9, it is said:

"The right to use the public streets or highways is not an absolute and unqualified right, but is subject to limitation and control by the legislature whenever necessary to provide for and promote the safety, peace, health, morals and general welfare of the people, subject only to limitations of reasonableness and equality."

In 42 C. J. 622 the author states:

"A statute or ordinance regulating the use and operation of motor vehicles must be reasonable in its terms and conditions."

In State v. Aldrich, 70 N. H. 391, 47 Atl. 602, 85 A. S. R. 631, the court said:

"No person has an absolute right to use for any purpose land acquired for a highway, but as the state holds lands acquired for the purpose of a highway in trust for the benefit of the public, so the right to legislate in regard to the use of highways is subject to the same limitations as its right to legislate in respect of other public matters; and a statute regulating the public right of travel, to be constitutional, must apply alike to all persons and should be reasonable."

And the same court in Re Opinion of the Justices, 81 N. H. 566, 129 Atl. 117, 39 A. L. R. 1023, reiterated this opinion, saying:

"The proposed act is designed to regulate the use of public highways. It relates to a matter over which the legislature has full power, subject only to the limitations of reasonableness and equality."

The Supreme Court of Maine in State v. Mayo, 106 Me. 62, 75 Atl. 295, 26 L. R. A. (N. S.) 502, 20 Ann. Cas. 512 expressed itself thus:

"It is an equal right of all to use the public streets for purposes of travel, by proper means, and with due regard for the corresponding rights of others; and it is also too well recognized in judicial decisions to be questioned that an automobile is a legitimate means of conveyance on the public highways."

And what the Iowa Supreme Court said in State v. Gish, 168 Ia. 70, 150 N. W. 37, Ann. Cas. 1917 B, 135, though relating to the use of the highways by apparently an ordinary traveler, may not be out of place. It said in part:

"Doubtless no one will contend that the legislature can absolutely prohibit the use of motor vehicles without transcending its constitutional limitations. It may regulate their use; but it can no more prohibit such use than it could prohibit the use of lumber wagons. The right of regulation rests upon its own peculiar ground, and is free from constitutional objection. As a means of such regulation, there may be imposed upon the owner reasonable duties which shall be performed by him as a condition precedent to his use of the vehicle."

The case of Jitney Bus Ass'n. v. Wilkes-Barre, 256 Pa. 462, 100 Atl. 954, relates to the regulation of a common carrier by a municipality, which, apparently, had full legis-

lative power to regulate. Some of the language used by the court is of interest. It said, in part:

"As to the right of the municipality to regulate, in the interest of public safety, the running of jitneys, as well as all other traffic upon the public streets, we have no doubt; the only question in such case being whether the requirements of an ordinance for that purpose are reasonable and not unduly burdensome. Regulation is not to be carried to the extent of prohibition. A jitney is an automobile, and by universal custom automobiles are permitted to use the streets of cities, as other vehicles. The fact that the owners of jitneys derive a profit from their operation makes no difference in their legal status. Much of the traffic upon the city streets is a matter of profit directly or indirectly to those engaged therein. The public highways are for the use of those engaged in commerce or industrial pursuits, no less than for pleasure cars. But if, from the usual manner of operating certain vehicles, the public safety is endangered, the right and duty of special regulation is clear."

As early as in the case of Macomber v. Nichols, 34 Mich. 212, 22 Am. Rep. 522, Mr. Justice Cooley said as follows:

"A highway is a public way for the use of the public in general, for passage and traffic, without distinction. Starr v. C. & A. Railroad Company, 4 Zab. 597. The restrictions upon its use are only such as are calculated to secure to the general public the largest practicable benefit from the enjoyment of the easement, and the inconvenience must be submitted to when they are only such as are incident to a reasonable use under impartial regulations."

See also Smallwood v. Jeter, supra, which, perhaps by way of *obiter dicta,* states that the use of the public highways by private carriers may be regulated, though not prohibited.

We have no doubt that the power of the legislature or municipality, in proper cases, may at times and under peculiar conditions even extend to prohibition. Thus it has been held that certain motor vehicles may be excluded

from some of the highways and streets. 42 C. J. 636; Comm. v. Kingsbury, 199 Mass. 542, 85 N. E. 848, L. R. A. 1915E, 264, 127 A. S. R. 513. Nor do we doubt that the legislature has the power to require a private carrier to become subject to regulations appropriate to that kind of a carrier. Frost & Frost Trucking Co. v. Railroad Comm., 271 U. S. 583, 46 Sup. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457; Morris v. Duby, 274 U. S. 135, 47 Sup. Ct. 548, 71 L. Ed. 966. And it has been stated—though we do not decide the point—that under such power a private carrier may be required to obtain a certificate of convenience and necessity, or at least a license. State v. Smith, supra; State v. Price, 122 Wash. 421, 210 Pac. 787; Public Service Commission v. Fox, 96 Misc. Rep. 283, 160 N. Y. S. 59, and see the Maryland and Oklahoma cases hereinafter specifically mentioned. But whatever regulations are adopted must be subject to the test of reasonableness in a broad sense. It may be, as said in the case of Hadfield v. Lundin, supra, that where the power to prohibit exists, the reasonableness of a regulation is a legislative question. Still, it is for the courts to determine in the first instance, we think, as to whether or not the right to prohibit exists in a particular case, and consequently whether or not a regulation which goes to the extent of prohibition is reasonable.

Let us apply the foregoing test. If it be true as intimated by some of the cases, that a person or corporation carrying on his or its own business may not be forbidden the use of the public highways in a reasonable way, but that a private carrier for hire may be, and that arbitrarily in every case, then some strange results would follow. A groceryman in a city could not be prevented from delivering his goods to his various patrons through an employee; but no one would be permitted to make an independent contract with such groceryman to do so as a private carrier; a company operating a sugar factory at Torrington, or some other place, would be permitted to contract to purchase sugar beets at the various farms, and through one of its employees

haul the beets over the public highways of this state; but no one would be permitted to make an independent contract with the factory to haul them as a private carrier. Other illustrations might be multiplied. An independent calling as a private carrier could in that manner be arbitrarily forbidden, and the only way in which it could be enjoyed, would be by becoming a servant of some employer. If the legislature has that arbitrary power, then we have reverted to the time when it, like a Roman emperor, may, by the stroke of a pen, create serfs and affix them to the soil.

The legislative act in question requires every motor transportation company to obtain a certificate from the public service commission to operate on the highways of the state. This certificate is required to set forth the special terms and conditions under which permission to operate is granted. No one may operate without it. Just what the legislature meant by providing for these special terms and conditions is hard to tell. But in any event every such company is subject to the power given to the commission under Sections 3 and 6 of the act, which make it a common carrier. The effect is that the calling of a private carrier for hire is forbidden. And that is not only true with private carriers which are in competition with common carriers, and not only with those which use the highways to a large extent, but it is true with every private carrier of any kind. No one possessing any motor vehicle may carry anything over the public highways (outside of municipal corporations) for hire without incurring the penalties and undergoing the conditions of the act. A single transaction of transporting for hire a sack of wheat or a box of apples for but a short distance, brings the conditions of the act and the penalties thereof, in case of violation, into operation, and that without reference to what other use the highways may be put. We are wholly unable to see how it can be of public benefit or for the general welfare to totally suppress private carriers on all the highways, to fix the rates of every private carrier, or to compel him to render annual accounts and sub-

mit to other requirements suitable only in the case of public carriers, and we may mention incidentally that it has been held that the requirements of a bond under Section 6 of the legislative act in question are appropriate only for common carriers. Smallwood v. Jeter, supra, and cases cited. In Mooney v. Tuckerman, supra, the court, speaking of a legislative act of Rhode Island, and its bearing on private carriers, said in part:

"The act's provisions are inappropriate to control carriers who have no interest in the necessities or conveniences of the general traveling public. The Utilities Commission exists to control the conduct of business affecting the interests of the public. * * * Respondent is not conducting a public utility nor holding himself out as doing so. No question of general public welfare is or can be involved in respondent's operation of his vehicles under the agreed statement of facts. The public has no greater interest than in any other private automobile as to when or over what route or how frequently respondent travels, nor in the amount he charges those whom he carries."

We think, accordingly, that the act in question, as it stands, and all of its provisions being interrelated, is wholly unreasonable as applied to private carriers.

The tendency of courts of late seems to be to discuss the subject now under consideration mainly in its relation to the fourteenth amendment of the Constitution of the United States. But we have thought it best not to lose sight of our own constitutional provisions, and have, therefore, discussed the subject in that connection, although we shall now proceed to mention the bearing of the fourteenth amendment, supra, thereon.

Under Section 4 of the act any transportation company complying with the conditions prescribed by the public service commission is given the right to use the public highways. And while it probably would be unfair to say that the act does not regulate the use of the highways, inasmuch as that very use brought about the legislation, still the main

method toward that end is by compelling all carriers for hire to become common carriers and submit to the burdens attached to the latter, and that can hardly be said to be an appropriate method for the end in view, at least as to a great portion of private carriers. And by reason of that fact the act in question is really more of an attempt to regulate motor carriers for hire than it is to regulate the highways, and the case, accordingly, we think, comes fairly within the spirit of the holding of the United States Supreme Court in Frost & Frost Trucking Company v. Railroad Commission, 271 U. S. 583, 46 Sup. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457; Michigan Commission v. Duke, 266 U. S. 570, 45 Sup. Ct. 191, 69 L. Ed. 445, 45 Sup. Ct. 191, 69 L. Ed. 445, 36 A. L. R. 1105; State of Washington, ex rel. v. Kuykendall, 275 U. S. 207, 48 Sup. Ct. 41, 72 L. Ed. 241, that a private carrier may not, in view of the 14th amendment of the United States constitution, be converted into a common carrier against his will, and that a condition to become a common carrier, attached to the right of a private carrier to the use of the public highways, is void. This was held to be true in Purple Truck Garage Company v. Campbell, 119 Or. 484, 250 Pac. 213, 51 A. L. R. 816, which construes a legislative act identical in all respects with that involved in the case at bar. The case of Hissem v. Guran, 112 O. S. 59, 146 N. E. 808, too, is directly in point, and is fully in accord with our holding. See also State v. Smith, supra; Mooney v. Tuckerman, supra; State v. Nelson, 65 Utah 457, 238 Pac. 237, 42 A. L. R. 849; Big Bend Auto Co. v. Ayers, 148 Wash. 521, 269 Pac. 802.

We have not overlooked the cases of Rutledge Co-op. Ass'n. v. Baughman, 153 Md. 297, 138 Atl. 29, 56 A. L. R. 1042; and Barbour v. Walker, 126 Okla. 227, 259 Pac. 552, 56 A. L. R. 1049. These cases at first blush, in any event, seem to be contrary to the spirit of the holding of the United States Supreme Court in the Frost case, supra, although each tries to distinguish that case. The cases further seem

to be inconsistent with Hissen v. Guran, supra. However, we need not decide whether they were correctly decided or not. There are several distinguishing features between the Maryland and the Oklahoma laws not found in our laws. The courts in both of these cases were apparently influenced by the fact that the private carriers there involved carried a great amount of property over the highways and bordered on being public carriers. What seems to be the main question there under consideration, namely, as to whether, under proper circumstances, private carriers may not be forbidden to use the highways in competition with common carriers, is not involved in this case. Nor are we now concerned with the question as to whether or not the legislature may not enlarge the meaning of the term "common carrier" as understood at common law, although it would seem to be clear that it could not well declare that every private carrier shall be embraced within the meaning thereof any more than it can by legislation declare white to be black or the reverse, and yet that is substantially what the legislative act in question attempts to do.

It follows from what we have said that the judgment of the District Court must be reversed, and the cause is remanded with instructions to enter judgment for plaintiff.

*Reversed and Remanded.*

KIMBALL and RINER, JJ., concur.